# In the United States District Court
# for the Southern District of Georgia
# Waycross Division

TERRANCE HINTON, as the
representative of Timothy
Hinton's estate,

    Plaintiff,

    v.

PAUL GRIECO, STACY WEBB,
MALCOLM JONES, AUDREY
WILLIAMS, MALACHI CLARK,
STEVE UPTON, and ANTHONY
STRICKLAND,[1]

    Defendants.

5:22-CV-16

## ORDER

Before the Court are Defendants' motions for summary judgment. Dkt. Nos. 46, 48. The motions have been thoroughly briefed and are ripe for review. Dkt. Nos. 46, 48, 52, 54, 60, 61. The Court heard oral argument on January 6, 2025. Dkt. No. 75. For the reasons stated below, Defendants' motions are **GRANTED.**

## BACKGROUND

This case arises from a fight between Timothy Hinton ("Hinton"), an inmate at Coffee Correctional Facility ("CCF"), and

---

[1] Defendant Strickland's name is spelled "Anthony" in the case caption, but the proper spelling is "Anthoni." Dkt. No. 52-8 at 4:14. The Clerk is **DIRECTED** to correct Defendant Strickland's name on the docket.

his cellmate. Dkt. No. 1 at 3. CCF is a medium-security prison in Coffee County, Georgia. Dkt. No. 48-3 ¶ 19. A private corporation, CoreCivic, Inc., operates CCF under contract with the Georgia Department of Corrections ("GDC"). Dkt. No. 48-4 ¶ 9. Defendants were all employed by CoreCivic or GDC during the relevant period. Dkt. No 1. ¶¶ 8, 79. Plaintiff Terrance Hinton ("Plaintiff"), Timothy Hinton's brother, alleges that each Defendant violated Hinton's Eighth Amendment right to be free from cruel and unusual punishment by failing to protect him from the fight. Id. at 13 (Count I: Section 1983 Deliberate Indifference/Failure to Protect). Plaintiff also alleges that six of seven Defendants breached their duty of care to Hinton by placing him in the cell in which the fight occurred. Id. at 17 (Count II: State Law Negligence).

## I.    The Gangster Disciples Threaten Hinton.

On March 24, 2020, an inmate housed in Hinton's unit threatened his life because Hinton owed a large debt to the leader of the Gangster Disciples, known as Moe G. Dkt. No. 48-3 ¶¶ 2, 7. Immediately after Hinton reported this threat, he was moved to administrative segregation. Id. ¶ 4. After the CCF classification committee verified this threat, CCF granted Hinton protective custody on April 1, 2020. Id. ¶¶ 7-8. Protective custody is a lockdown segregation unit, meaning that inmates do not congregate

with other inmates in a common area.[2] Id. ¶ 9. When deciding which inmates to house together in protective custody, CCF officials consider the inmates' Prison Rape Elimination Act ("PREA") assessments (i.e., "whether either inmate is a known PREA victim or PREA aggressor"), known security threat group ("STG") or gang affiliations, body size (i.e., "a 5'3" inmate who weighs 135 pounds would not be placed with a 6'6" inmate who weighs 320 pounds"), security level (i.e., minimum security or medium security), and personal history. Id. ¶ 10.

## II.  Mingo Attacks Hinton.

On April 9, 2020, Hinton's cellmate in protective custody was an inmate named Francois Maurice Mingo. Id. ¶ 13. Mingo was fifty-five years old, stood at five feet and nine inches tall, weighed 160 pounds, and had no known STG or gang affiliations. Id. ¶ 17. At the time, Hinton was fifty-five years old, six feet tall, and 175 pounds. Dkt. No. 48-10 at 2. On the evening of April 10, 2020, there was an altercation between Hinton and Mingo.[3] Dkt. No. 46-2 ¶ 21. Hinton testified that Mingo slammed Hinton's head into the

---

[2] The administrative segregation unit houses inmates in both protective custody and disciplinary segregation. Dkt. No. 48-3 ¶ 12. "Generally, inmates in protective custody are only housed with other inmates in protective custody." Id.

[3] All Defendants admit that the fight between Mingo and Hinton took place, but six of seven Defendants controvert the details of the altercation only to the extent that "none witnessed the altercation and so do not know the details of how it progressed." Dkt. No. 61-1 ¶ 50.

wall in the middle of the night while Hinton was using the bathroom. Dkt. No. 52-2 ¶ 38. Mingo struck him several more times, causing Hinton to fall to the floor and temporarily lose consciousness. Id. ¶ 39.

Notably, Defendant Clark's testimony is the only evidence connecting Mingo's actions to the Gangster Disciples' earlier threat. See Dkt. No. 52-10. It is important to note, though, that this sole testimonial link developed after the altercation. Specifically, Defendant Clark testified that another one of the officers asked Mingo, "what happened?" while they escorted him after the altercation. Id. at 54:9-14. Defendant Clark recollected "Mingo saying that he shouldn't owe people money." Id. at 54:15-16.[4] When Hinton regained consciousness, CCF staff transported him for medical treatment. Id. at 53:20-21. After the fight, Hinton shared a cell with other inmates in protective custody without any other physical altercation. Dkt. No. 46-1 ¶ 27. On October 4, 2021, Hinton was released on parole. Dkt. No. 48-3 ¶ 1.[5]

---

[4] The Court draws in Plaintiff's favor the inference that this statement meant "[Hinton] shouldn't owe people [i.e., Moe G.] money." Dkt. No. 52-2 ¶ 41.

[5] Hinton passed away on May 17, 2024, while the summary judgment motions were pending. Dkt. No. 63. Pursuant to Federal Rule of Civil Procedure 25(a)(1), Terrance Hinton, Timothy Hinton's brother and the representative of his estate, has been substituted as Plaintiff in this action. Dkt. No. 73.

**III. Hinton's Requests for Placement in a Single Cell**

Before the fight occurred, Hinton asked each of the seven Defendants to be placed in a private, single cell. See Dkt. No 54-3. Hinton told several Defendants that GDC policy required him to be single-celled. Dkt. No. 46-3 at 10, 35:4–9, 12, 45:4–9. It is undisputed, however, that CoreCivic's contract with GDC allows it to set its own policies when placing an inmate in administrative segregation or protective custody. Dkt. Nos. 48-3 ¶ 21; 54-1 ¶ 21.[6] The relevant policy reads:

> Single occupancy cells/rooms should be available and utilized when an inmate/detainee: [] Is classified as Maximum custody, when necessary for safety and security; [] Has severe medical disabilities; [] Suffers from serious mental illness; Is a sexual predator; [] Is likely to be exploited or victimized by others; [] and/or Has other special needs for single housing.

Dkt. No. 46-5 at 4. There are only five single cells in the segregation unit; the remainder are double bunks. Dkt. No. 52-8 at 14:21–23. Defendants consistently testified that, at any given time, the segregation unit is at capacity. Dkt. Nos. 52-3 at 67:6–10, 52-7 at 30:12–31:21, 64:17–19. Out of the segregation unit, CCF officials must single-cell two types of inmates, those on constant watch due to suicide risk and those inmates in the medical

---

[6] Despite this contract language, the GDC Administrative Segregation policy states: "This policy is applicable to all facilities housing GDC offenders." Dkt. No. 52-4 at 3. This policy, which is dated after the altercation between Hinton and Mingo, provides that "Offenders in Protective Custody shall not be double bunked except in emergency situations." Id. at 5.

unit likely to spread a contagious disease. Dkt. Nos. 52-8 at 14:3-15:3, 52-9 at 46:15-47:18.

The seven Defendants' specific roles[7] in Hinton's placement are as follows:

### A.   Defendant Paul Grieco

At the time of the altercation, Defendant Grieco was the GDC regional facilities operations coordinator, also known as the facilities monitor, at CCF. Dkt. No. 46-1 ¶ 3. As the facilities monitor, Defendant Grieco's job was to ensure that CoreCivic complied with the terms of its contract with GDC in its operation of CCF. Id. ¶ 4. To do so, Defendant Grieco conducted daily inspections. Id. According to Hinton, while in protective custody, he asked Defendant Grieco "dozens of times" to be placed in a single cell when Defendant Grieco would come by during morning inspection. Id. ¶ 18. Defendant Grieco does not recall these requests. Dkt. No. 52-3 at 76:17-19. Plaintiff purports that Defendant Grieco denied Hinton's requests and told Hinton that they do not single-cell inmates in protective custody because CCF is private. Dkt. No. 52-2 ¶ 10.

---

[7] The Court must "conduct an individualized analysis of each Defendant's actions and omissions and whether they were causally related to the alleged violation" in a Section 1983 case. Alcocer v. Mills, 906 F.3d 944, 948 (11th Cir. 2018).

### B.   Defendant Steve Upton

Defendant Upton was the CCF Warden at the time of the fight. Dkt. No. 1 ¶ 19. Like Defendant Grieco, Defendant Upton did regular rounds in the segregation unit. Dkt. No. 54-3 ¶ 5. According to Hinton, while in protective custody, he asked Defendant Upton to be placed in a single cell several times when Defendant Upton made his rounds. Dkt. No. 54-2 ¶ 20. Defendant Upton does not remember these interactions with Hinton, nor does he remember the altercation between Hinton and Mingo. Dkt. No. 52-7 at 14:2-15, 74:15-17. According to Plaintiff, Defendant Upton repeatedly stated CCF does not single-cell inmates in protective custody. Dkt. No. 54-3 ¶ 5.

### C.   Defendant Stacy Webb

Defendant Webb was the Assistant Warden of Security at CCF. Dkt. No. 48-3 ¶ 31. According to Hinton, while in protective custody, he told Defendant Webb he "did not want to be in a room with anybody" because of the threat from the Gangster Disciples. Dkt. No. 54-3 ¶ 7. Hinton "probably" repeated this statement "two or three more times" to Defendant Webb. Id. Defendant Webb testified that he does not remember these requests but does remember the single cells were occupied by inmates who needed to be there more than Hinton during April 2020. Dkt. No. 52-6 at 35:3-37:1, 53:8-12. Hinton testified that Defendant Webb told him on "at least a couple of occasions" that he would move Hinton to a

single cell but never did. Dkt. No. 46-3 at 8, 26:19-24. In his declaration, Hinton alleged that "Mr. Webb seemed to be put off that [Hinton] kept asking so much, and about the third or fourth time [Hinton] told him about the threat, [Defendant Webb] said, 'I hope you can fight.'" Dkt. No. 54-3 ¶ 7.

### D.    Defendant Malcolm Jones

Defendant Jones worked at CCF as a correctional officer. Dkt. No. 48-3 ¶ 34. At the time of the incident, Jones was the chief of security at CCF. Id. Just as with Defendant Webb, Hinton purports that he told Defendant Jones he "did not want to be in a room with anybody" because of the threat from the Gangster Disciples. Dkt. No. 54-3 ¶ 7. Hinton "probably" repeated this statement "two or three more times" to Defendant Jones. Id. Defendant Jones testified that he does not recall these conversations, and he disputes that these conversations occurred. Dkt. No. 52-9 at 19:11-19. According to Plaintiff, Defendant Jones declined to single-cell Hinton and stated, "we don't do that here." Dkt. Nos. 46-3 at 8, 29:16-54, 54-3 ¶ 7.

### E.    Defendant Malachi Clark

Defendant Malachi Clark worked at CCF as a correctional officer. Dkt. No. 48-3 ¶ 33. He was a lieutenant and the acting unit manager over the CCF segregation unit at the relevant time. Id. According to Hinton, before he was granted protective custody, he told Defendant Clark, "I feared for my life because there was

8

too much free movement with gangs in segregation and because I was not in a one-man cell." Dkt. No. 54-3 ¶ 8. Thereafter, Hinton asked Defendant Clark to be moved to a single cell "pretty much every time [Hinton] saw him." Id. Defendant Clark testified that "everyone" knew that Hinton was granted protective custody because of the threat from the Gangster Disciples. Dkt. No. 52-10 at 18:6-8. Defendant Clark recalled that Hinton requested to be single-celled because he feared "everybody." Id. at 36:14-37:3. Particularly, Defendant Clark stated that Hinton "told everybody he wanted a single cell. He didn't specifically say that he didn't want to be in a room with Mingo." Id. at 47:17-19. Hinton testified that Defendant Clark responded to his requests to be single-celled by stating "This is not Burger King, you can't have it your way." Dkt. Nos. 46-3 at 32:5-13, 54-3 ¶ 8.

**F.   Defendant Audrey Williams**

Defendant Audrey Williams worked at CCF as a correctional officer. Dkt. No. 48-3 ¶ 36. She was the chief of unit management at the time of the incident. Id. According to Hinton, the day before the fight with Mingo, Hinton told Defendant Williams about the Gangster Disciples threat, asked to be moved, and said "the policy required" that Hinton be single-celled because he was in protective custody. Dkt. No. 54-3 ¶ 8. Hinton testified that Defendant Williams stated, "we don't do that here." Dkt. No. 46-3

at 9, 31:14-20. Defendant Williams does not remember this conversation. Dkt. No. 52-5 at 34:9-14, 37:14-16.

### G.    Defendant Anthoni Strickland

Defendant Anthoni Strickland worked as a correctional officer in CCF's segregation unit. Dkt. No. 48-3 ¶ 32. Defendant Strickland was the dorm sergeant at the time of the incident. Dkt. No. 54-3 ¶ 6. According to Hinton, while in protective custody, he asked Defendant Strickland "to put [Hinton] in a single cell pretty much every time [Hinton] saw [Strickland]—which was quite a lot because [Strickland] was in segregation pretty much all day." Id. Hinton alleges that Defendant Strickland refused to move him each time Hinton asked. Dkt. No. 46-3 at 10, 35:2-12. Defendant Strickland does not recall these conversations. Dkt. No. 52-8 at 19:2-4, 22:18-20. Defendant Strickland testified that had he been told that Mingo was a threat to Hinton, Defendant Strickland would have moved Hinton. Id. at 60:5-11.

### LEGAL AUTHORITY

The Court shall grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute of those material facts "is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient" for a jury to return a verdict for the nonmoving party. Id. at 252. "A party opposing summary judgment may not rest upon the mere allegations or denials in its pleadings." Walker v. Darby, 911 F.2d 1573, 1576 (11th Cir. 1990). "Rather, its responses . . . must set forth specific facts showing that there is a genuine issue for trial." Id. at 1576–77.

The Court views the record evidence "in the light most favorable to the [nonmovant]," Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and will draw all justifiable inferences in the nonmovant's favor, Anderson, 477 U.S. at 255. At this stage, "a plaintiff's testimony cannot be discounted on summary judgment unless it is blatantly contradicted by the record, blatantly inconsistent, or incredible as a matter of law, meaning that it relates to facts that could not have possibly been observed or events that are contrary to the laws of

nature." <u>Feliciano v. City of Miami Beach</u>, 707 F.3d 1244, 1253 (11th Cir. 2013).

**DISCUSSION**

Defendants move for summary judgment on both Plaintiff's federal and state-law claims. The Court begins with the federal claims.

## I.   Plaintiff's Failure-to-Protect Claim Under 42 U.S.C. § 1983 Against All Defendants

Prisons "must 'take reasonable measures to guarantee the safety of the inmates.'" <u>Farmer v. Brennan</u>, 511 U.S. 825, 832 (1994) (quoting <u>Hudson v. Palmer</u>, 468 U.S. 517, 526–27 (1984)). Accordingly, prison "officials have a duty to protect prisoners from violence at the hands of other prisoners." <u>Carter v. Galloway</u>, 352 F.3d 1346, 1349 (11th Cir. 2003) (per curiam) (alterations adopted) (quoting <u>Farmer</u>, 511 U.S. at 833). "A prison official violates the Eighth Amendment's prohibition against cruel and unusual punishment if he is deliberately indifferent to a substantial risk of serious harm to an inmate who suffers injury." <u>Lane v. Philbin</u>, 835 F.3d 1302, 1307 (11th Cir. 2016). "Not every injury suffered by one inmate at the hands of another, however, translates into a constitutional liability for prison officials responsible for the victim's safety." <u>Marbury v. Warden</u>, 936 F.3d 1227, 1233 (11th Cir. 2019) (internal quotation marks and citation omitted). Indeed, "occasional, isolated attacks by one prisoner on

another may not constitute cruel and unusual punishment." Purcell ex rel. Estate of Morgan v. Toombs Cnty., 400 F.3d 1313, 1320 (11th Cir. 2005).

To establish a deliberate indifference claim for failure to protect against an attack, a plaintiff must "produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." Carter, 352 F.3d at 1349. "Merely negligent failure to protect an inmate from attack does not justify liability under section 1983." Brown v. Hughes, 894 F.2d 1533, 1537 (11th Cir. 1990) (citing Davidson v. Cannon, 474 U.S. 344, 347-48 (1986)). Defendants argue that Plaintiff has failed to demonstrate that any Defendant acted with deliberate indifference towards Hinton's safety to establish a § 1983 claim for failure to protect. Dkt. Nos. 46, 48.

**A. Element One: Substantial Risk of Serious Harm**

The first element of a failure-to-protect claim "requires the plaintiff to show 'conditions that were extreme and posed an unreasonable risk of serious injury to his future health or safety.'" Marbury, 936 F.3d at 1233 (quoting Lane, 835 F.3d at 1307). When analyzing this first element, "the court uses an objective standard." Caldwell v. Warden, FCI Talladega, 748 F.3d 1090, 1099 (11th Cir. 2014) (citation omitted). An inmate must show a "strong likelihood of injury, rather than a mere

13

possibility" to establish a substantial risk of serious harm. Brooks v. Powell, 800 F.3d 1295, 1301-03 (11th Cir. 2015) (internal quotations marks and citation omitted) (holding that a remote risk requiring "a perfect storm of events" for the inmate to be in "imminent or foreseeable danger" is not "substantial enough to trigger Eighth Amendment liability"); see also Carter, 352 F.3d at 1349-50. As such, the danger "must be actual, rather than potential or speculative." Estate of Owens v. GEO Grp., Inc., 660 F. App'x 763, 769 (11th Cir. 2016). That an inmate was, in fact, injured—by itself—is insufficient to show a substantial risk of serious harm. E.g., Brooks, 800 F.3d at 1302.

Plaintiff contends that this first element is met because Hinton was the target of a particularized threat or danger.[8] Dkt. Nos. 52, 54. Defendant Grieco argues that there is no evidence that there was an individualized risk to Plaintiff *after* he was placed in protective custody. Dkt. No. 46-2 at 7. CoreCivic Defendants argue that Plaintiff cannot satisfy the first prong because Plaintiff has not shown a specific and substantial risk to Plaintiff's safety posed by Mingo. Dkt. No. 48 at 11-12, 16.

It is undisputed that Mingo did not threaten Hinton prior to the assault, and thus, the alleged substantial risk of serious

_____

[8] A plaintiff may prove this first element either by showing (1) a particularized threat of harm or (2) generalized conditions of dangerousness. Bugge v. Roberts, 430 F. App'x 753, 759 (11th Cir. 2011). Plaintiff argues the first.

harm arises from the earlier threat made by the Gangster Disciples. See Dkt. Nos. 48-3 ¶ 16, 54-1 ¶ 16. Thus, the question before the Court on the first element is whether the previous threat from the Gangster Disciples posed a substantial risk of serious injury to Hinton once he was placed in protective custody.

The facts show that once in protective custody, Hinton was placed with other protective custody inmates, rather than inmates in segregation for disciplinary issues, and did not congregate with other inmates in common areas. Dkt. Nos. 48-3 ¶¶ 9, 12, 54-1 ¶¶ 9, 12. The evidence also shows that Defendants considered (1) inmates' PREA assessments, (2) known STG or gang affiliations, (3) body size, (4) security level, and (5) personal history when placing Hinton with a cellmate. Dkt. Nos. 48-3 ¶ 10, 54-1 ¶ 10. Plaintiff disputes that Defendants considered all five of these factors when moving Hinton within protective custody, dkt. no. 54-1 ¶ 11, yet does not dispute that Mingo was a compatible cellmate for Hinton based on these factors. Relevant here, (1) Mingo had no known security threat group or gang affiliation, including the Gangster Disciples, (2) Mingo was fifty-five years old, the same age as Hinton, and (3) Mingo was smaller in stature than Hinton (three inches shorter and fifteen pounds lighter). Dkt. Nos. 48-3 ¶ 17, 54-1 ¶ 17.

Plaintiff does not explain how Hinton's being housed with Mingo in protective custody created an actual, particularized risk

15

posing a strong likelihood of injury. Plaintiff cites only to the complaint to assert that "the day before the attack, Mr. Mingo was receiving and sending 'kites'—written messages—under the cell door," and thus, there was a strong likelihood Mingo would carry out the Gangster Disciples threat. Dkt. No. 54-2 ¶ 48 (citing Dkt. No. 1 ¶ 48). "In opposing a motion for summary judgment, [however] 'a party may not rely on his pleadings to avoid judgment against him.'" Resolution Tr. Corp. v. Dunmar Corp., 43 F.3d 587, 592 (11th Cir. 1995).[9] Moreover, Plaintiff submitted Hinton's sworn declaration with no reference to Hinton's observation of Mingo receiving "kites." Dkt. No. 54-3. In his deposition, Hinton was asked, "If Mingo was also in restricted housing, how would he get paid by someone in Gangster Disciples?" Dkt. No. 46-3 at 6, 19:18-20. Hinton responded, "I don't know." Id. at 6, 19:21.

Beyond the kite allegation, Plaintiff argues more generally that "information flows freely in prisons, even in segregation, and a threat by a gang can be carried out by a non-gang member." See Dkt. Nos. 52 at 1, 7, 54 at 4. While a threat is not erased

---

[9] A verified, or sworn, complaint may be used as evidence to oppose a summary judgment motion. Perry v. Thompson, 786 F.2d 1093, 1095 (11th Cir. 1986). In this case, the complaint is not verified because the complaint contains no language indicating that Plaintiff swears the contents of the complaint are true and based on personal knowledge. Dkt. No. 1; see also Roy v. Ivy, 53 F.4th 1338, 1343-45 (11th Cir. 2022). "Unsworn statements may not be considered by a district court in evaluating a motion for summary judgment." Roy, 53 F.4th at 1347.

once an inmate enters protective custody, Plaintiff nevertheless must show that the risk, which originated prior to Defendants' grant of protective custody, put Hinton in actual, foreseeable danger at the time of the fight to satisfy the first element of a failure-to-protect claim. See Brooks, 800 F.3d at 1301; Owens, 660 F. App'x at 769. The speculative statement that information flows freely in prisons, and thus, the Gangster Disciples contacted Mingo, is not enough to overcome summary judgment. Giles v. Winn-Dixie Montgomery, LLC, 574 F. App'x 892, 894 (11th Cir. 2014) ("[U]nsupported speculation does not meet a party's burden of producing some defense to a summary judgment motion." (quoting Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1181 (11th Cir. 2005) (alterations adopted))). "Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." Id.

Therefore, Plaintiff does not put forth "enough details" (any details, really) about the threat to enable the Court or Defendants to conclude that it presented "a strong likelihood of injury, not a mere possibility." Marbury, 936 F.3d at 1236 (citation omitted). "Notably, where a plaintiff presents evidence that he reported only a vague, generalized fear or problems with other inmates rather than a specific and particularized threat of harm, courts have not hesitated to find the plaintiff's claims insufficient as a matter of law." Reid v. Polk, No. 14-cv-1408, 2018 WL 1426428,

17

at *7 (M.D. Fla. Mar. 22, 2018) (dismissing deliberate indifference claim where the inmate requested to be moved to an isolated protective dormitory based on a threat from gang members because the gang "knew he had committed a sexual crime against a young child, and therefore, his life was in danger" and the prison denied the request) (citing Carter, 352 F.3d at 1349-50); McBride v. Rivers, 170 F. App'x 648, 655 (11th Cir. 2006) (per curiam).[10] Hinton's eventual fight with Mingo leading to his injury—by itself— is insufficient to show a substantial risk of serious harm. See Brooks, 800 F.3d at 1302. Thus, there is no record evidence showing an "actual, rather than potential or speculative" risk to Hinton once Defendants addressed the threat and separated Hinton from known Gangster Disciples by granting him protective custody. Owens, 660 F. App'x at 769.

### B. Element Two: Deliberate Indifference

Even if Plaintiff's failure-to-protect claim satisfied the first element, Plaintiff has not shown that any Defendant acted with deliberate indifference to Hinton's safety. To be deliberately indifferent, Defendants must have been "subjectively

---

[10] In response to the plaintiff's grievance, the Florida Department of Corrections stated "you just wanted single cell housing. You have not demonstrated additional threats towards you, only that you fear a dangerous situation could present itself due to the types of inmates that you are housed with." Reid, 2018 WL 1426428, at *12. The same is true here. At its core, Plaintiff's claim is, as Hinton said in his deposition, "[He] wanted to be in a cell by [him]self." Dkt. No. 46-3 at 8, 28:9.

18

aware of the substantial risk of serious harm in order to have had a 'sufficiently culpable state of mind.'" Farmer, 511 U.S. at 834-38. This second element requires that the prison official "actually (subjectively) knows that an inmate is facing a substantial risk of serious harm, yet disregards that known risk by failing to respond to it in an (objectively) reasonable manner." Rodriguez v. Sec'y for the Dep't of Corr., 508 F.3d 611, 617 (11th Cir. 2007) (citing Farmer, 511 U.S. at 829, 837, 844). This means the "official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837. To satisfy this standard, the officials must have acted "with 'subjective recklessness as used in the criminal law.'" Wade v. McDade, 106 F.4th 1251, 1255 (11th Cir. 2024) (en banc) (quoting Farmer, 511 U.S. at 839). Hence, "the deliberate indifference standard—and the subjective awareness required by it—is far more onerous than normal tort-based standards of conduct sounding in negligence." Goodman v. Kimbrough, 718 F.3d 1325, 1332 (11th Cir. 2013).

**1. Defendants' Subjective Awareness**

First, the Court analyzes Defendants' subjective awareness. Wade, 106 F.4th at 1255; Farmer, 511 U.S. at 837. Here, the facts show that Plaintiff asked each Defendant to be moved to a single cell after being granted protective custody. Dkt. No. 54-2 ¶ 6.

Viewing the facts in the light most favorable to Plaintiff, the Court accepts that each Defendant knew this single-cell request was motivated by the earlier threat made by the Gangster Disciples. Dkt. No. 52-10 at 18:6–8, 36:14–37:3 (Defendant Clark testified that "everyone" knew that Hinton was granted protective custody because of the threat from the Gangster Disciples and recalled that Hinton requested to be single-celled because he feared "everybody."). The relevant question is not, however, whether each Defendant knew of Hinton's general fear of the Gangster Disciples; the appropriate inquiry is whether each Defendant subjectively knew that Hinton faced a substantial risk of serious harm at the time he or she denied Hinton's request for a single cell.

"The unfortunate reality is that threats between inmates are common and do not, under all circumstances, serve to impute actual knowledge of a substantial risk of harm." Marbury, 936 F.3d at 1236 (internal quotation marks and citation omitted). Whether the inmate gave advance notice of a specific threat or fear is relevant to the Court's analysis, though it is not dispositive. Moulds v. Bullard, 345 F. App'x 387, 392 (11th Cir. 2009) (citing Carter, 352 F.3d at 1349-50; Farmer, 511 U.S. at 848). The officials' knowledge must be beyond a "generalized awareness" of the risk of violence. Marbury, 936 F.3d at 1234; Woodyard v. Ala. Dep't of Corr., 700 F. App'x 927, 933 (11th Cir. 2017). "Successful deliberate-indifference claims will generally require some further

reason—beyond the plaintiff having informed the defendant officers of the threat—that a prison official could have concluded that a particular threat evidenced a substantial threat" of serious harm. Marbury, 936 F.3d at 1236; McBride, 170 F. App'x at 655 (holding an inmate's "general request that [guards] not place him in a cell with anyone whom he might have problems," and statement that "me and that dude had problems. I'm in fear for my life. Don't put me in the cell with him" were insufficient to show that the defendants had subjective knowledge of a risk of serious harm).

A failure-to-protect claim will not survive summary judgment if a plaintiff does "not present any evidence beyond informing officials of *only* a single threat, offering no other risk factors present for a prison official to draw the inference that he faced a substantial risk of harm." Milledge v. Sec'y, Fla. Dep't of Corr., 760 F. App'x 741, 744 (11th Cir. 2019) (emphasis added). Where there is no indication that the inmate's cellmate was involved with the rival gang or "had any issues related to race, debt, romance, or anything else that might render one an excessive danger to the other," there are not facts from which the prison officials can make an inference of a specific and substantial threat to the inmate. Id.

McBride and Milledge steer the Court's subjective knowledge analysis. In both cases, the Eleventh Circuit affirmed the district court's grant of summary judgment where an inmate informed prison

officials of his fear, asked not to be placed with a specific inmate, and later was attacked by that inmate. McBride, 170 F. App'x at 655; Milledge, 760 F. App'x at 744. Without more, this was not enough for the prison officials to draw the inference that the inmate faced a *substantial* risk of harm. McBride, 170 F. App'x at 655; Milledge, 760 F. App'x at 744. The same is true here. Plaintiff does not offer any specific "risk factors" present once Hinton was in protective custody that would have alerted Defendants to the fact that Hinton faced a substantial risk of serious harm if he was not single-celled. See Milledge, 760 F. App'x at 744. Hinton did not report that Mingo, or any other potential cellmate, was associated with the Gangster Disciples or otherwise had a specific issue with Hinton.[11] Nor did Hinton continue to receive threats while in protective custody. Thus, Defendants had nothing more than a generalized awareness of Hinton's fear of the Gangster Disciples. "Such a generalized awareness of risk in these circumstances does not satisfy the subjective awareness requirement." Carter, 352 F.3d at 1350.

---

[11] The only evidence that Mingo acted on behalf of the Gangster Disciples is Defendant Clark's recollection of Mingo saying that Hinton "shouldn't owe people money" after being asked what happened. Dkt. No. 52-10 at 54:9-16. Because this statement was made *after* the fight with Mingo, it cannot serve to impute the knowledge that Defendants knew Mingo posed a threat before the fight.

Accordingly, district courts in this circuit have held that a request for a cell reassignment or a request for a single cell, without more, does not provide a sufficient basis to make the inferential leap that an inmate faced a substantial risk of serious harm. See, e.g., Reyes v. Ellis, No. 21-cv-924, 2023 WL 5019539, at *2–3 (N.D. Fla. July 6, 2023), report and recommendation adopted by 2023 WL 5022673 (Aug. 7, 2023) (request for cell reassignment); Patton v. Shadwick, No. 15-CV-540, 2016 WL 7210446, at *11–12 (N.D. Ala. Dec. 13, 2016) (The failure to totally segregate after the inmate asked to be single-celled was not deliberate indifference.); Conghau Huu To v. Elston, No. 10-cv-02401, 2014 WL 1329285, at *13 (N.D. Ala. Mar. 31, 2014) ("If all a prisoner had to do to maintain a single cell assignment is to proclaim any cellmate a danger, prison officials would lose all control over housing assignments.")

Conversely, placing an inmate with a cellmate that the officials have a specific reason to know poses a threat supports a finding of deliberate indifference. Scott v. Miami Dade Cnty., 657 F. App'x 877, 879 (11th Cir. 2016) (affirming denial of motion to dismiss where the plaintiff filed a written grievance that included a list of the inmates who had threatened and continued to threaten him; this list included an inmate with whom plaintiff was later housed in a courthouse holding cell and who attacked plaintiff in that holding cell); Caldwell, 748 F.3d at 1095

23

(reversing summary judgment where the plaintiff was returned to his cell with the same cellmate "within hours" of his cellmate endangering his life); Arries v. Hill, 686 F. Supp. 3d 1279, 1307 (N.D. Ga. 2022) (denying motion to dismiss where plaintiff alleged specific facts supporting that there was a risk he would be seriously harmed by other inmates in the holding cell "because the cell contained Black inmates who were aware that Plaintiff had been shouting racial epithets and that at least one individual had gang affiliation and was charged with violent crimes"). These cellmate-specific cases are distinguishable from this case. As an example, in Trejo v. Butler, the district court denied summary judgment to the prison guards for failing to protect Trejo from an inmate attack that occurred while he was housed in the protective custody unit. No. 21-cv-390, 2024 WL 3100313, at *8 (S.D. Ala. June 3, 2024), report and recommendation adopted by 2024 WL 3455325 (June 21, 2024). Trejo requested to be housed in a single cell or transferred to another facility daily because he feared for his life because of a threat by the Crip gang. Id. at *2. However, the key difference in Trejo is that the Crip gang continually sent him death threats through paper notes to his cell once he was in protective custody. Id. at *8. Here, it is undisputed that Hinton did not receive any more threats once placed in protective custody. Dkt. Nos. 46-1 ¶ 9, 48-3 ¶ 2, 52-1 ¶ 9, 52-2 ¶¶ 2, 6, 54-1 ¶ 2, 54-2 ¶¶ 2, 6. As such, Defendants did not have a specific reason

to know that Mingo, or any non-Gangster Disciple cellmate, posed a threat.

In sum, the Eleventh Circuit has declined to hold a "single threat," Milledge, 760 F. App'x at 744, or a request for a "cell transfer," Brown, 894 F.2d at 1537, constitutes "sufficient evidence that any defendant was aware or should have been aware of a strong likelihood that [the inmate] would be assaulted." Id. There is no evidence that the Gangster Disciples reached Mingo, or any other potential cellmate, for any Defendant to deduce that Hinton faced a substantial risk at the time. Thus, the undisputed evidence is insufficient as a matter of law to show any Defendant had subjective awareness of a substantial risk of serious harm once Hinton was granted protective custody.

**2. Defendants' Responses**

Second, to satisfy the deliberate indifference element, Plaintiff must show that Defendants acted recklessly. Rodriguez, 508 F.3d at 620; see also Wade, 106 F.4th at 1255 ("[A] deliberate-indifference plaintiff must prove that the defendant acted with subjective recklessness as used in the criminal law, . . . with the caveat that, in any event, a defendant who responds reasonably to a risk, even a known risk, cannot be found liable under the Eighth Amendment." (internal citations and quotation marks omitted)). A defendant who responds reasonably to a risk will not be held liable for the failure to protect an inmate, "even if the

harm ultimately was not averted." Id. (quoting Farmer, 511 U.S. at 844).

### a. Failure to Comply with Policy

Plaintiff argues that Defendants' failure to follow the applicable CoreCivic policy[12] constitutes evidence of deliberate indifference. Dkt. Nos. 52 at 10, 54 at 8.[13] Plaintiff also argues the GDC policy, which *requires* a person granted protective custody to be housed in a single cell except in the case of an emergency, should factor into the Court's analysis. Dkt. No. 54-2 ¶¶ 23, 27. Despite the GDC and CoreCivic contract stating that GDC allows CoreCivic to apply its own policies in protective custody housing,

---

[12] Again, the policy reads:

> Single occupancy cells/rooms should be available and utilized when an inmate/detainee: [] Is classified as Maximum custody, when necessary for safety and security; [] Has severe medical disabilities; [] Suffers from serious mental illness; [] Is a sexual predator; [] Is likely to be exploited or victimized by others; and/or [] Has other special needs for single housing.

Dkt. No. 46-5 at 4. Plaintiff calls this the "Protective Custody policy" but nowhere in the record is it labeled as such. Dkt. Nos. 52 at 9-10, 52-1, 54 at 7, 54-1.

[13] Plaintiff relies on Bowen v. Warden, Baldwin State Prison, in which the Eleventh Circuit held "a policy of double-celling inmates" violated the Eighth Amendment. 826 F.3d 1312, 1317 (11th Cir. 2016). In Bowen, however, the defendants knew (1) the cellmate was extremely mentally ill, violent, and dangerous, having assaulted his previous cellmate, (2) the two cellmates were kept in a small cell with an opaque door, and (3) the cellmate was six inches taller than the decedent-inmate and outweighed him by nearly one hundred pounds. Id. None of those facts are present here.

Plaintiff highlights that the GDC policy, itself, states, "This policy is applicable to all facilities housing GDC offenders." Id.

This argument concerning the policies does not overcome summary judgment for several reasons. First, Plaintiff has not established that there is a genuine dispute over whether Defendants complied with the CoreCivic policy. The evidence shows there were five single cells in the segregation unit. Dkt. No. 52-8 at 14:21–23. Defendants testified that these cells, and the unit at large, were consistently full. Dkt. Nos. 52-3 at 67:6–10; 52-7 at 30:12–31:21, 64:17–19. Thus, Plaintiff has not identified any evidence to show that Defendants' declination to put Hinton in one of these private cells contravenes the policy that single cells should be available and utilized.[14] That is, the record evidence shows that CCF utilized single cells, but Plaintiff hypothesizes—rather than pointing to affirmative evidence—that in April 2020, there was a private cell occupied by an inmate whose need to be single-celled was outweighed by Hinton's. See Dkt. No. 52-8 at 14:21–23.

Second, the Eleventh Circuit has held that if an official deviates from policy, "even grossly so," that deviation does not amount to deliberate indifference. Goodman, 718 F.3d at 1334. Therefore, even if it was common practice at CCF to double-cell

---

[14] Further, the undisputed evidence demonstrates that CCF complied with the policy's criterion for single-celling inmates with serious mental health risks or severe medical needs. Dkt. Nos. 46-5, 52-8 at 14:3-15:3, 52-9 at 46:15-47:18.

inmates who are on protective custody for a single threat, this does not rise to the level of a constitutional violation without more.

Finally, the Court must heed the Eleventh Circuit's admonition against "second-guessing the difficult choices that prison officials must face and of improperly extending deliberate indifference standards. . . ." LaMarca v. Turner, 995 F.2d 1526, 1538 (11th Cir. 1993); see also Whitley v. Albers, 475 U.S. 312, 321–22 (1986) ("Prison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." (alterations adopted)).

Therefore, the Court considers the policies only to the extent they show that any Defendant "knew of ways to reduce the harm" under the policy but "recklessly declined to act," Rodriguez, 508 F.3d at 620, or "recklessly disregarded solutions within his means," LaMarca, 995 F.2d at 1538.

**b. Defendants' Reasonable Response**

Plaintiff has not shown that any Defendant responded to the Gangster Disciples' threat in an objectively unreasonable manner. An unreasonable response may have been a complete failure to grant Hinton protective custody altogether. Rodriguez, 508 F.3d at 621–22 (remanding for the district court to determine whether prison

official responded reasonably when a plaintiff requested protective management and transfer based on threats to his life, yet the official recommended he be released into the general population). Likewise, an unreasonable response may have been placing Hinton with a known Gangster Disciple or Moe G. himself, Scott, 657 F. App'x at 884, or even placing Hinton back with Mingo after the fight, Caldwell, 748 F.3d at 1095 (reversing summary judgment where the plaintiff was returned to his cell with the same cellmate "within hours" of his cellmate endangering his life); Dkt. No. 46-3 at 5, 15:19–21, 9, 33:5–7 (It is undisputed that Hinton was not placed back in a call with Mingo).

Defendants' responses here are unlike the officers' responses in cases where the inmate was placed with a cellmate who posed a serious, known threat. For example, in Scott, a case on which Plaintiff relies, the inmate informed the defendants of continuous gang threats, including a list of names of those threatening him; this showed subjective awareness of a substantial risk of harm. 657 F. App'x at 883. The defendants in Scott then responded in an objectively unreasonable manner by placing the plaintiff-inmate in a courthouse holding cell with one of the named, threatening gang members. Id. at 884. Here, Plaintiff agrees that Mingo had no known gang affiliations nor does he allege that he was ever placed with a known Gangster Disciples affiliate. Dkt. Nos. 48-3 ¶ 17, 54-1

¶ 17.  Indeed, Moe G was moved out of Hinton's unit altogether. Dkt. No. 48-12 at 3, 15:21.

Therefore, the act of placing Hinton with an inmate, who (1) was on protective custody, (2) had no known security threat group or gang affiliation, including the Gangster Disciples, (3) was fifty-five years old, the same age as Hinton, and (4) was physically smaller than Hinton, shows no evidence of an unreasonable response. Dkt. Nos. 48-3 ¶ 17, 54-1 ¶ 17; see also Goodwin v. DeSpain, No. 15-0417-WS-N, 2018 WL 2946420, at *6 (S.D. Ala. Mar. 7, 2018) ("Defendants were aware of [Plaintiff's] enemies and their potential harm to Plaintiff, and Defendants acted reasonably in housing Plaintiff in segregation away from the risk of serious, known harm."), report and recommendation adopted by 2018 WL 2944158 (June 12, 2018); Dunston v. Churchwell, No. 18-cv-90, 2019 WL 3558195, at *4-6 (N.D. Fla. July 5, 2019) (finding no deliberate indifference where plaintiff alleged a hit had been placed on his life, the plaintiff was segregated in disciplinary confinement, his grievance was referred to the security department, and he was eventually released to the general population), report and recommendation adopted by 2019 WL 3557883 (Aug. 5, 2019).

Lastly, Plaintiff has presented no affirmative evidence that there was a single cell available for Hinton at the time of his request, and thus, has not shown his requested response was

possible, much less reasonable. See Anderson, 477 U.S. at 257 (A "plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment."); see also Dkt. No. 48 at 18 ("There were no single cells available in the segregation unit when Plaintiff was granted protective custody, so placing him in a single cell would not only have been an objectively unreasonable response to a generalized risk of harm, but a logistical impossibility.") Instead, Defendants invariably testified that the segregation unit was at capacity. Dkt. Nos. 52-3 at 67:6-10, 52-7 at 30:12-31:21, 64:17-19.

Plaintiff further suggests that Hinton could have been placed in the medical dorm or another inmate could have been moved out of segregation to make space for Hinton to have a single room. Dkt. No. 54-1 ¶ 28. But a holding that Defendants were required to put Hinton at risk of a contagious disease in the medical unit or put another inmate at risk by prematurely moving him out of segregation squarely requires this Court to second-guess the policy decisions of the officials in this case, which the U.S. Supreme Court and the Eleventh Circuit have cautioned against. See LaMarca, 995 F.2d at 1538; Whitley, 475 U.S. at 321-22.[15]

---

[15] At the hearing on this motion, Plaintiff argued that, alternatively, Hinton should have been transferred to another facility with single cells available. Dkt. No. 75. This argument is similarly unavailing. First, it requires the Court to suppose that there was a single cell available in another unspecified Georgia facility. See Cordoba, 419 F.3d at 1181. Second, it

Defendants did not recklessly disregard solutions within their means by placing Hinton and Mingo together based on the information available to them. Even if there was an available single cell, a feasible solution is not the only objectively reasonable solution. See Mosley v. Zachery, 966 F.3d 1265, 1268 (11th Cir. 2020). In fact, the Eleventh Circuit has rejected the argument that the only reasonable response after a threat is immediate placement in the inmate's housing of choice. See id. (affirming grant of summary judgment for prison guards where the inmate argued "the only reasonable response" after he was threatened was to place him in protective custody, but the guards instead placed him in a "highly monitored environment" immediately after the threat). Thus, it was not an objectively unreasonable response to the earlier Gangster Disciples threat to place Hinton with a cellmate, like Mingo, once Hinton was in protective custody.

In conclusion, Defendants' failure to single-cell Hinton under the circumstances did not constitute deliberate indifference to his safety. This case is a far cry from the cases where a housing placement rendered an inmate's confinement cruel or

---

undercuts Plaintiff's argument regarding the severity of the threat due to Gangster Disciples' pervasiveness in Georgia correctional institutions, thus requiring Defendants to evaluate the potential threat at another institution for a transfer to be reasonable. Third, it does not override the reasonableness of the actions that were taken in this case.

unusual. Therefore, Defendants' motions for summary judgment as to Plaintiff's failure-to-protect claim are **GRANTED**.[16]

## II.  Defendant Grieco's Qualified Immunity Defense

Defendant Grieco, the lone GDC Defendant, separately moves for summary judgment on Plaintiff's failure-to-protect claim on qualified immunity grounds. Because the Court has already found Plaintiff's failure-to-protect claim fails against all Defendants, the Court need not address Defendant Grieco's qualified immunity defense. Nevertheless, the Court will examine the parties' arguments.

Qualified immunity is an affirmative defense. Ledea v. Metro-Dade Cnty. Police Dep't, 681 F. App'x 728, 729 (11th Cir. 2017) (citing Skritch v. Thornton, 280 F.3d 1295, 1306 (11th Cir. 2002)). When successfully invoked, qualified immunity shields government officials who perform discretionary functions from civil liability. Nolin v. Isbell, 207 F.3d 1253, 1255 (11th Cir. 2000) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Qualified immunity allows "government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation." Durruthy v. Pastor, 351 F.3d 1080, 1087 (11th Cir. 2003) (citation omitted). It shields "all but the plainly incompetent or one who is knowingly violating the federal

---

[16] Accordingly, the Court does not reach the parties' arguments regarding causation and damages.

law." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) (citation omitted).

"An official asserting the affirmative defense of qualified immunity must initially establish that he was acting within the scope of his discretionary authority, and the burden then shifts to the plaintiff to show that the official is not entitled to qualified immunity." Ledea, 681 F. App'x at 729 (citing Skop v. City of Atlanta, 485 F.3d 1130, 1136–37 (11th Cir. 2007)). Here, Plaintiff concedes that Defendant Grieco acted within his discretionary authority. Dkt. No. 52 at 14 n.6.

Once the defendant establishes that his relevant conduct fell within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity does not apply under the two-prong test established by the U.S. Supreme Court in Saucier v. Katz, 533 U.S. 194, 201 (2001). Under the first prong, the Court determines whether the facts viewed in the light most favorable to the plaintiff "show the officer's conduct violated a constitutional right." Id.; see also Hope v. Pelzer, 536 U.S. 730, 736 (2002) ("The threshold inquiry a court must undertake in a qualified immunity analysis is whether plaintiff's allegations, if true, establish a constitutional violation."); Beshers v. Harrison, 495 F.3d 1260, 1265 (11th Cir. 2007) (citing Scott v. Harris, 550 U.S. 372, 377 (2007)). Second, the Court considers whether the right allegedly violated was clearly established at

the time of the violation. Hope, 536 U.S. at 739; Saucier, 533 U.S. at 201; Scott, 550 U.S. at 377; Underwood v. City of Bessemer, 11 F.4th 1317, 1328 (11th Cir. 2021) ("[W]e ask two questions: (1) whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right, and (2) if so, whether the right at issue was clearly established at the time of the defendant's alleged misconduct." (internal quotation marks omitted)). Because Plaintiff has not met his burden to show the violation of a constitutional right, the Court need not proceed past step one of the qualified-immunity analysis.

Nevertheless, Plaintiff has not shown (1) that a "materially similar case has already been decided," whose facts are similar enough to give Defendant Grieco notice, (2) that a "broader, clearly established principle should control the novel facts" of his case, or (3) that Defendant Grieco's conduct "so obviously violates [the] constitution that prior case law is unnecessary." Edger v. McCabe, 84 F.4th 1230, 1235 (11th Cir. 2023) (articulating the three methods of showing a right is clearly established). Plaintiff cites to Scott, Rodriguez, and Bowen, all of which are inapposite here. Dkt. No. 52 at 14–18. First, Scott is unpublished; unpublished cases do not serve as binding precedent and cannot be relied upon to define clearly established law for purposes of the Court's qualified immunity analysis. See Crocker v. Beatty, 995 F.3d 1232, 1241 n.6 (11th Cir. 2021). Second, Rodriguez is easily

distinguishable because there, the Eleventh Circuit analyzed whether the failure to grant protective custody altogether based on threats of gang violence would be constitutionally violative. 508 F.3d at 621–22 (remanding for the district court to determine whether prison official responded reasonably when a plaintiff requested protective custody and transfer based on gang-related threats to his life, yet the prison official recommended he be released into the general population). In this case, CCF officials acted quickly to separate Hinton and grant him protective custody. See Dkt. Nos. 48-3 ¶¶ 4–8, 54-1 ¶¶ 4–8. Third, Plaintiff's reliance on Bowen is unavailing because it concerned an inmate who was too violent and unstable to be housed with anyone, and that inmate killed his cellmate. 826 F.3d at 1317, 1324–25 (reversing grant of motion to dismiss where the risk of harm was obvious because the defendants knew (1) the cellmate was extremely mentally ill, violent, and dangerous, having assaulted his previous cellmate, (2) the two cellmates were kept in a small cell with an opaque door, and (3) the cellmate was six inches taller than the decedent-inmate and outweighed him by nearly one hundred pounds, among other facts). Here, Defendants did not have a similar reason to know Mingo would attack Hinton. Hinton's continuous fear of the Gangster Disciples gave rise to only a "potential or speculative" possibility of harm, Owens, 660 F. App'x at 769, rather than the high "degree of specificity in the risk of harm" posed by the

known, "volatile and dangerous nature" of the cellmate in <u>Bowen</u>. 826 F.2d at 1322. Thus, Defendant Grieco is entitled to qualified immunity under either prong.

## III. Plaintiff's Claims for Punitive Damages and Attorney's Fees

### A. Punitive Damages

Plaintiff must establish that Defendants were "motivated by an evil motive or intent, or there must be reckless or callous indifference to federally protected rights" to receive punitive damages for his Section 1983 claim. <u>Anderson v. Atlanta</u>, 778 F.2d 678, 688 (11th Cir. 1985) (citing <u>Smith v. Wade</u>, 461 U.S. 30 (1983)). As explained above, Plaintiff has not established that Defendants committed any constitutional violation, and he has not established that any of the requirements for punitive damages exist here. Plaintiff, therefore, is not entitled to punitive damages for his Section 1983 claims against Defendants. Thus, Defendants' motion for summary judgment as to Plaintiff's federal claim for punitive damages is **GRANTED.**

### B. Attorney's Fees

Plaintiff's federal claim for attorney's fees also fail. Plaintiff cannot recover attorney's fees for his Section 1983 claims when these substantive claims fail. <u>See</u> 42 U.S.C. § 1988(b) ("[T]he court, in its discretion, may allow the *prevailing* party, other than the United States, a reasonable attorney's fee." (emphasis added)). Because all of Plaintiff's federal substantive

claims fail, Plaintiff's claim for attorney's fees on his federal claims fail as well. Therefore, Defendants' motion for summary judgment as to Plaintiff's federal claim for attorney's fees is **GRANTED**.

## IV. **Plaintiff's State Law Claim for Negligence Against Defendants Upton, Webb, Jones, Williams, Clark, and Strickland**

Finally, Plaintiff brings a negligence claim against the six CoreCivic Defendants under Georgia law. Dkt. No. 1 at 17. After granting summary judgment on Plaintiff's Section 1983 claim against Defendants—the only federal claims in this action—the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims which lack an independent jurisdictional basis. See 28 U.S.C. § 1367(c)(3) (permitting a court to decline exercising supplemental jurisdiction when it "has dismissed all claims over which it has original jurisdiction"); see also Raney v. Allstate Ins. Co., 370 F.3d 1086, 1088–89 (11th Cir. 2004) ("The decision to exercise supplemental jurisdiction over pendant state claims rests within the discretion of the district court. We have encouraged district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial." (citations omitted)); Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent

38

jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims.").

The Court, therefore, **DISMISSES without prejudice** Plaintiff's state law negligence claim, as well as his related claims for punitive damages and attorney's fees. See Carnegie-Mellon Univ., 484 U.S. at 350 ("[W]hen the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice." (citing Mine Workers v. Gibbs, 383 U.S. 715, 726-27 (1966)) (footnote omitted)); see also Smith v. Franklin Cnty., 762 F. App'x 885, 891 n.3 (11th Cir. 2019) (affirming the district court's dismissal of state law claims without prejudice after it granted summary judgment on the federal claims).

## CONCLUSION

For these reasons, Defendants' motions for summary judgment, dkt. nos. 46, 48, are **GRANTED** as to:

- Plaintiff's Section 1983 failure-to-protect claim against all Defendants (Count I);

- Plaintiff's federal claim for punitive damages; and

- Plaintiff's federal claim for attorney's fees.

These claims are therefore **DISMISSED with prejudice**. Further, the Court declines to exercise supplemental jurisdiction as to

Plaintiff's state law claims, that is:

- Plaintiff's claim for negligence against Defendants Upton, Webb, Jones, Williams, Clark, and Strickland (Count II);

- Plaintiff's state-law claim for punitive damages; and

- Plaintiff's state-law claim for attorney's fees.

Plaintiff's state law claims are therefore **DISMISSED without prejudice**. There being no claims remaining in this federal action, the Clerk is **DIRECTED** to enter judgment in favor of Defendants on the federal claims and close this case.

SO **ORDERED** this 30th day of January, 2025.

_____
HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA